# In the United States Court of Federal Claims

No. 11-570 C

(Filed Under Seal: December 23, 2011)

Reissued: January 18, 2012[1]

_____

| | |
|---|---|
| CRASSOCIATES, INC, | * Post-award bid protest; Second award of |
| | * contract following court order enjoining |
| Plaintiff, | * performance of earlier-awarded contract; |
| | * Standard of review – *Bannum*; Agency's |
| v. | * failure to address impact of awardee's |
| | * performance of the enjoined contract; |
| THE UNITED STATES, | * Waiver – *Blue and Gold*; Failure to follow |
| | * RFP evaluation scheme; Modification of |
| Defendant, | * evaluation scheme on reprocurement; |
| | * Prejudice lacking; Failure to conduct |
| and | * meaningful discussions; Alleged flaw in |
| | * agency's technical evaluations; Evaluation |
| SPECTRUM HEALTHCARE | * of professional services clause (FAR § |
| RESOURCES, INC., | * 52.222-46); Best value determination; |
| | * Protest rejected. |
| Defendant-Intervenor. | * |
| | * |

_____

[1] The court issued this opinion under seal on December 23, 2011 and invited the parties to submit proposed redactions by January 17, 2012.  While the United States and Spectrum Healthcare Resources requested only minimal redactions (principally focusing on pricing), CRAssociates asked for significant redactions of proposal and agency evaluation information.  The court finds most of the latter requested redactions to be overbroad.  Indeed, if the court were to make comparable redactions for Spectrum, the public version of this document  would scarcely be comprehensible.  As this court has noted, "[t]he better approach is to honor the 'presumption of public access to judicial records.'"  *Allied Tech. Group, Inc. v. United States*, 94 Fed. Cl. 16, 23 (2010) (quoting *Baystate Techs., Inc. v. Bowers*, 283 Fed. Appx. 808, 810 (Fed. Cir. 2008)).  The court notes that when CRAssociates prevailed in an earlier protest before this court, it hardly proposed any reactions to this court's opinion.  One can only speculate as to why it sees the world differently now.  At all events, the court does not believe that CRAssociates will be harmed by disclosure of much of the information it seeks to redact.  The court thus has redacted primarily information related to the offeror's prices (while also correcting some minor nonsubstantive or typographical errors).  The redacted material is represented by brackets [ ].

_____

## OPINION

_____

*Kenneth Bernard Weckstein*, Brown Rudnick, LLP, Washington, D.C., for plaintiff.

*Michael Paul Goodman*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Amy Laderberg O'Sullivan*, Crowell & Moring, LLP, Washington, D.C., for defendant-intervenor.

**ALLEGRA, Judge:**

This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record.  Plaintiff, CRAssociates, Inc. (CRA), challenges the U.S. Army's award of a contract to Spectrum HealthCare Resources (Spectrum) to provide community health care services to military personnel and their dependents in the National Capital Area (NCA).  This is the second time such an award has been protested in this court, with the undersigned having set aside a prior award to Spectrum upon finding that the procurement process that led to that award was flawed prejudicially.  *See CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357 (2010).  But, as the old maxim goes, "[t]hat was then, this is now."  And as will be seen, there are important differences between this case and the last – differences that, for the reasons which follow, lead the court to **DENY** plaintiff's motion for judgment on the administrative record and **GRANT** defendant's and defendant-intervenor's cross-motions.

## I.   BACKGROUND

The administrative record in this case reveals the following:

Plaintiff is currently furnishing health care services to military beneficiaries out of two Family Health Centers (FHCs) in Fairfax and Woodbridge, Virginia.  These community-based FHCs provide family-centered primary care and some specialty care for a major segment of the NCA military population and their family members.  As of March of 2010, these facilities had over 47,000 beneficiaries, generating 17,000 clinic visits per month and 49,000 pharmacy prescriptions per month.

### A.   The RFP

On April 16, 2009, the Army issued Request for Proposals (RFP) No. W81K04-09-R-0002, seeking a contractor to provide community-based primary and specialty health care

services to 47,000 eligible military beneficiaries.  The RFP contemplated the award of a fixed price contract, with cost reimbursement line items, for a six-month transition period, a one-year base period, and four one-year option periods.  In responding to the solicitation, offerors were directed to submit an administrative proposal, a technical proposal, past/present performance information, a price proposal and a subcontracting plan.  Regarding these documents, the RFP commanded that "[a]ll documents submitted in response to this RFP must be fully responsive to and consistent with the requirements of the RFP."[2]  The RFP provided that the award of the contract would be on a negotiated, "best value" basis.

### 1.      Proposal Requirements

The RFP required the contractor to provide all necessary facilities, maintenance, staffing, supplies and equipment for the two FHCs, known as FHC-North and FHC-South.  The RFP listed the contract's required services and supplies in the form of contract line items (CLINs).  The first two CLINs corresponded to the two FHCs, which were to be built during a six-month transition period.  Other CLINs focused on primary and specialized health care services, including primary care and optometry clinics, a medical laboratory, physical therapy, a pharmacy, and numerous other specialized care services to be provided during the contract base period and all four option periods.  The CLINs also specified that the contractor would be responsible for providing all building leases, maintenance, and administrative support.

The RFP's Performance Work Statement (PWS) detailed the scope of services and specific requirements within each type of service.  Regarding the two FHCs, the PWS stated "[e]ach clinic shall be designed to meet the scope of services outlined in the PWS, to maximize staff productivity and efficiency and, at a minimum, to support the current level of service represented in the existing clinics."  It added that the contractor must provide "improved access [to] primary care appointing," guaranteeing patients same-day acute-care appointments under certain conditions.  Further describing the approach embodied in its requirements, the PWS advised that "[t]his healthcare concept includes improved access to primary care appointing, individual provider and provider team empanelment with an emphasis on patient outcomes, continuity of care, and quality care as defined in the Joint Commission and TRICARE standards, and overall patient satisfaction."

The RFP laid out requirements for "Contractor Furnished Equipment," including the contractor-provided FHCs.  It also listed all "Government Furnished Equipment" (GFE) and provided that "[t]he Government will replace, as required, the [GFE]," when required due to "wear and tear."

---

[2]  Regarding the content of documents, the RFP added –

The Government intends to make award without holding discussions with offerors.  However, the Contracting Officer reserves the right to hold discussions if deemed necessary.  Therefore, offerors are encouraged to include their best terms and conditions (both price and technical) in the initial offer.

Each FHC was required to be "no further than a 30 minute drive" from DeWitt Army Community Hospital.  Facility location was also to take into account the location of other Department of Defense military treatment facilities and, in particular, "not encroach on other DOD clinics' population."  In addition, facilities were required to "meet all state, county and federal laws/regulations governing construction, occupation, accessibility, and maintenance of community health care facilities of this general nature and scope."  Technical proposals were to address various factors and subfactors relating to personnel; management plan; facility location and layout; staffing model; transition plan; quality control plan; and subcontracting opportunities.  For factor 3, facility location and layout, the RFP instructed the offeror to "[d]escribe the proposed clinic locations and layouts at each facility," including "site locations, traffic patterns, parking, entrances, energy savings objectives, etc."  For factor 5, transition plan, the RFP instructed the offeror as follows:

> Provide a detailed transition plan on how you plan to prepare for full performance under the contract. Include a detailed milestone chart depicting recruitment, facility acquisition and facility preparation, training, transfer of [Government Furnished Equipment], patient notification, credentialing and all other actions needed to prepare for full performance.  Discuss all resources and schedules.

For the past and present performance proposal, contractors were required to provide information regarding "all relevant contracts and subcontracts started or completed within the past three years" for the contractor and all subcontractors performing major or critical aspects of the work. The pricing proposal was required to contain "a unit price for each of the CLINs/subCLINs" and "a detailed cost element breakout for each of the line items."  The price proposal was to "include a narrative detailing the basis of the labor rates, facility costs and each cost element making up the total price," as well as a "comprehensive breakout of proposed staffing by category showing hours and labor rates."

## B.    Evaluation Criteria

The RFP directed the Contracting Officer (CO) to use a "Technical-Cost Trade-off process to determine which offer has the overall best value to the Government."  The RFP indicated that the following factors and significant subfactors would be considered in making that best value determination:

| Factors | Subfactors |
|---|---|
| 1.  Personnel | a.  Recruitment<br>b.  Retention/Employee Relations<br>c.  Compensation Plan |
| 2.  Management Plan | a.  Demand Management/Access to Care<br>b.  Education Programs<br>c.  Program Objectives |
| 3.  Facility Location & Layout | |
| 4.  Staffing Model | |
| 5.  Transition Plan | |
| 6.  Quality Control Plan | |
| 7.  Subcontracting Opportunities | |
| 8.  Past & Present Performance | |
| 9.  Price Proposal | |

In addition, for large businesses, the CO was to consider the offeror's subcontracting plan. Regarding the relative importance of these factors and subfactors, the RFP stated:

> Factors 1, 2, 3, and 4 are of equal importance and when combined are significantly more important than Factors 5, 6, and 7 combined.  Factor 5 is significantly less important than Factors 6 and 7, which are approximately equal. Factor 1, subfactors a, b, and c are of equal importance.  Factor 2, subfactors a, b, and c are of equal importance.  Factors 1 through 7, when combined are significantly more important than Factor 8.  Non-price Factors 1 through 8, when combined, are significantly more important than Factor 9 Price.

The subcontracting plan was not to be rated as part of the technical proposal, but was to be rated by the CO and approved by the Small Business Administration.

Each offeror's technical approach (factors 1 through 7) was to be evaluated for "strengths, deficiencies, significant weaknesses and risks" and given one of five possible adjectival ratings: "excellent" (no weaknesses or deficiencies), "good" (one or more strengths, no deficiencies, and minimally disruptive weaknesses), "satisfactory" (no strengths, no deficiencies, and no material weaknesses), "marginal" (minor omissions, and weaknesses or minor deficiencies), or "unsatisfactory" ("fails to demonstrate a basic understanding of the requirement . . . [and] has major omissions, weaknesses, or deficiencies").  With regard to the technical evaluation, the RFP further provided:

> Using the Technical Factors above, each evaluator will conduct an independent evaluation of each proposal documenting the strengths, deficiencies, significant weaknesses, and risks associated with each proposal.  Upon completion of individual evaluations, the entire evaluation team will form a consensus opinion of each offeror's ability to accomplish the projected work and prepare a narrative supporting the team's conclusions.  In the event the team is unable to form a

consensus, the team will prepare majority and minority opinions for the
Contracting Officer's consideration.

Past and present performance (factor 8) was to be assessed to determine the "risks
associated with each offeror's likelihood of success in performing the requirements stated in the
RFP based on that offeror's demonstrated performance on recent, relevant contracts," and then
rated accordingly. The offeror was to receive a rating of "excellent" for very low risk, "good"
for low risk, "adequate" for moderate risk, "marginal" for high risk, "poor" for very high risk,
and "unknown" if the offeror had "little/no relevant past performance upon which to base a
meaningful performance risk prediction." The RFP stated that the CO could "consider favorable
or unfavorable past performance as a tiebreaker when comparing offerors who have no past
performance history with offerors who do have past performance history." For example, if all
other factors were relatively equal, "an offeror with a favorable past performance history may be
selected over an offeror with no past performance history." Past performance evaluation was to
consider predecessor companies, key personnel, and "subcontractors that will perform major or
critical aspects of the work."

The price proposal was "not rated," although it was to be reviewed for "reasonableness
and realism." Regarding the latter analysis, the RFP prescribed –

> Realism will pay particular attention to the facility costs, direct labor rates and
> fringe benefits. Comparison to the [Independent Government Estimate] and
> analysis of the offeror's price proposal breakout and rational [sic] will be
> reviewed for excessive cost risk. Proposals found to have high cost risk will not
> be considered for award.

In addition, the RFP incorporated the clause found at FAR § 52.222-46, Evaluation of
Compensation for Professional Employees, which required the Army to evaluate professional
compensation to ensure that it was not "unrealistically low or not in a reasonable relationship to
the various job categories," so as to "impair the Contractor's ability to attract and retain
competent professional employees." With regard to the Source Selection Decision, the RFP
provided:

> The Contracting Officer and the Source Selection Evaluation Board (SSEB)
> Chairperson will brief the Source Selection Authority (SSA) during the initial
> evaluations, during competitive range determinations and just prior to the
> completion of the SSEB. Upon completion of the SSEB, the Contracting Officer
> and the SSEB Chairperson will prepare a final recommendation to the SSA. The
> SSA will then exercise prudent business judgment and make the source selection
> decision based on the requirements of the solicitation.

The RFP did not contain any special provision defining how evaluations would occur in response
to a successful bid protest.

### C.     Proposals and the Evaluation Process

On May 5, 2009, all interested prospective offerors participated in a walk-through tour of CRA's two incumbent FHC facilities.[3]  The Army received two proposals, one from Spectrum and the other from CRA.  The Source Selection Evaluation Board (SSEB) met from June 15 to 26, 2009.  From June 19, 2009 through June 27, 2009, the individual members of the SSEB finalized individual evaluation worksheets, providing their views of the offerors' technical proposals; at later points during this same period, the evaluators prepared and signed consensus evaluation worksheets identifying strengths and weaknesses in each of the technical proposals. Following this evaluation, the SSEB issued first discussion letters to CRA and Spectrum on July 8 and 9, 2009, respectively.  It then had face-to-face discussions with CRA and Spectrum on July 14, and 15, 2009, respectively.  The offerors were instructed to review all aspects of their proposals and provide any revisions no later than August 14, 2009.  Both offerors submitted revised proposals on August 14, 2009.  After the SSEB conducted a second round of evaluations from August 16 through 21, 2009, during which it generated a new set of individual and consensus evaluation worksheets, the Army issued second discussion letters on August 21, 2009, citing a variety of remaining issues.  Each letter warned that the issues identified "may not be all inclusive and therefore, you are advised to review your entire proposal."  Offerors were instructed to provide final proposal revisions to include revised technical, pricing and subcontracting plan proposals no later than September 4, 2009.  Both offerors submitted final proposal revisions by September 4, 2009.  On September 8 and 9, 2009, the SSEB met to review the factors that had previously received less than "satisfactory" ratings; individual and consensus evaluation worksheets were again generated.

On September 10, 2009, the SSEB briefed the CO and the Source Selection Authority (SSA).  The latter approved reopening discussions and, on September 15, 2009, the Army issued third discussion letters to address the factors and subfactors still rated as "marginal."  Offerors were instructed to provide revised technical proposals addressing shortcomings identified in the

---

[3]  Following the walk-through and a pre-proposal conference, the Army responded to questions from the prospective offerors, including the following questions regarding CRA's advantage as the incumbent contractor:

> Q.1. How does the Government intend to negate the effect of facility build-out costs that give an unfair advantage to the incumbent who will have no such costs? RESPONSE: The information is to be broken out in the cost proposal and will be evaluated accordingly in accordance with the solicitation.

> Q.51. The CLINs to be priced include a 6 month transition period for FHC-North and FHC-South.  How does the government intend on evaluating all non-incumbent offerors on the transition period?  The incumbent would not need a transition period. RESPONSE: The incumbent is required to meet the same requirements of the solicitation as all other offerors and will be evaluated accordingly.

discussion letters by September 21, 2009.  Offerors submitted final revised proposals and the CO was briefed on September 21, 2009.  Following evaluation of these proposals the final adjectival ratings for the major factors, and proposed prices were as follows:

| Factors | Spectrum | CRAssociates |
|---|---|---|
| 1.  Personnel | Good | Good |
| 1A.  Recruitment | Good | Good |
| 1B.  Retention/Employee Relations | Satisfactory | Good |
| 1C.  Compensation | Good | Good |
| 2.  Management Plan | Satisfactory | Satisfactory |
| 2A.  Demand Management | Satisfactory | Marginal |
| 2B.  Education Programs | Satisfactory | Good |
| 2C.  Program Objectives | Satisfactory | Satisfactory |
| 3.  Facility Location & Layout | Good | Satisfactory |
| 4.  Staffing Model | Satisfactory | Marginal |
| 5.  Transition Plan | Satisfactory | Satisfactory |
| 6.  Quality Control Plan | Satisfactory | Good |
| 7.  Subcontracting Opportunities | Satisfactory | Satisfactory |
| 8.  Past and Present Performance | Adequate | Excellent |
| Price | $[] | $[] |

Spectrum received ratings superior to CRA on three of the first four most heavily-weighted factors – Facility Location & Layout, Management Plan and Staffing Model.  Based upon this information, the CO determined that Spectrum's proposal offered the best value to the Army.

The Army awarded the contract to Spectrum on September 23, 2009.  On that same day, it notified CRA that it would not receive the contract.  The Army held face-to-face debriefings with both CRA and Spectrum on September 28, 2009.

**D.  GAO Protests**

On October 2, 2009, CRA filed its first protest with the GAO, followed by two supplementary protests on October 8, 2009, and November 12, 2009, respectively.  On November 25, 2009, the Army notified CRA that it planned to take limited corrective action on CRA's second supplemental protest and reevaluate Spectrum's past performance.  As the result of this corrective action, Spectrum's rating for past performance was changed from "adequate" to "unknown" and CRA's management plan rating went from "marginal" to "satisfactory."  On December 13, 2009, because of the Army's corrective action, the GAO dismissed CRA's first three protests as academic.  On December 24, 2009, the Army again awarded the contract to Spectrum.

On December 29, 2009, CRA filed a fourth protest with the GAO, challenging, among other things, the CO's finding of responsibility.  On January 22, 2010, the Army notified Spectrum of its intent to take its second corrective action and for the CO to revisit his responsibility determination.  After exchanging information with Spectrum, on February 17, 2010, the CO again determined that Spectrum was responsible and, based on the previous SSA

decision, again awarded the contract to Spectrum.  On February 23, 2010, CRA filed its fifth protest with the GAO, followed by two supplemental protests on March 1, 2010, and March 15, 2010.  On June 1, 2010, the GAO denied CRA's remaining protests.

During these protests, CRA continued to provide medical services through a series of bridge contracts.  The Army awarded CRA the first of these contracts on April 1, 2007, for the period from April 1, 2007, through September 30, 2008.  It awarded CRA a second bridge contract for October 1, 2008, through September 30, 2009, with a six-month option period until March 31, 2010, followed by a three-month extension to June 30, 2010.  The Army subsequently awarded CRA another bridge contract effective through October 1, 2010, with the possibility of several six-month options/extensions.

### E.    First Court Proceeding

On June 2, 2010, CRA filed a complaint in this court, together with an application for a temporary restraining order and a motion for a preliminary injunction.  On June 3, 2010, Spectrum filed a motion to intervene as defendant-intervenor, which the court granted that same day.  On June 4, 2010, the court held a status conference at which the parties agreed to move forward with the motion for a preliminary injunction on an accelerated briefing schedule.  At the conclusion of oral argument on June 29, 2010, the court denied plaintiff's motion for preliminary injunction, orally finding that the existence of the bridge contract had, in the short term, negated plaintiff's claims of irreparable harm.  Shortly thereafter, Spectrum began its transition work, as contemplated by the contract and Spectrum's proposed transition plan.  On July 20, 2010, plaintiff filed a motion for judgment on the administrative record.  On August 16, 2010, defendant and defendant-intervenor filed cross-motions for judgment on the administrative record.  Following completion of the briefing, the court held oral argument on the motions on September 14, 2010.

On October 4, 2010, the court granted plaintiff's motion for judgment on the administrative record and enjoined Spectrum's performance of the contract.  *CRAssociates, Inc.*, 95 Fed. Cl. 357.  The court sustained various of plaintiff's assertions of error, finding: (i) the Army departed from the RFP's evaluation criteria in failing to compare Spectrum's proposed compensation levels to those paid under the predecessor contract, as required by FAR § 52.222-46, 95 Fed. Cl. at 369-78; (ii) the Army's explanation of a marginal rating for CRA's proposed staffing plan was not sufficient to allow for appropriate judicial review, *id*. at 384; (iii) the Army's technical evaluation of the bidders' facility locations and layouts to provide community health care services constituted disparate treatment, in violation of the FAR, because the Army did not treat both bidders the same in evaluating the excessive space both proposed to have at their FHCs, *id*. at 384-85; and (iv) the Army departed from the RFP's evaluation criteria in assigning Spectrum a unknown past and present performance rating, *id*. at 385-87.  The court rejected the other assertions of error made by plaintiff.  The court found that the errors demonstrated by plaintiff were prejudicial – "that but for those errors, 'there was a substantial chance [CRA] would have received the contract award.'"  *Id*. at 390 (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  Finally, the court

concluded that the existence of irreparable injury to plaintiff, as well as the balancing of harms in favor of plaintiff and the public interest, required the court to grant injunctive relief to plaintiff. 95 Fed. Cl. at 390-91.  In that injunction, the court indicated that "[d]efendant, acting by and through the Department of the Army, is hereby ENJOINED from performing or allowing others to perform on the contract awarded pursuant to (RFP) No. W81K04–09–R–0002.  Said parties also must suspend any related activities that may result in additional obligations being incurred by the United States under the contract."  *Id*. at 392.

### G.    Further Evaluation by the Agency

The day following the issuance of this order, the Army issued a stop work order.  The Army paid Spectrum $[] for the three months of transition work that it had already performed. On October 7, 2010, the Army notified CRA and Spectrum that, as the result of this court's decision, it was "reopening limited discussions" with the intent of "award[ing] a new contract as result of further negotiations under this solicitation."  The letter further indicated that "[a]ll aspects of your proposal will be extended, other than those impacted by [the] revised Period of Performance, wage determinations and areas of technical and cost discussions."  The letter finally asked the offerors to indicate in writing, by October 15, 2010, whether they wished to continue in the competition.

Both offerors responded to the Army indicating that they were still interested in competing for the award.  Thus, on October 8, 2010, Spectrum indicated that it wished "to continue pursuing a contract under the solicitation."  On October 14, 2010, CRA wrote the Army expressing its continued interest in receiving the award.  In that letter, it wrote:

> CRA hopes that the amendment issued by the Army will account for the unfair technical and price advantage that was provided to Spectrum Healthcare Resources, Inc. ("Spectrum") as a result of the Army's prior improper award to Spectrum.  Specifically, in response to directions from the Army, CRA gave Spectrum access to CRA's employees and facilities.  As a result, Spectrum obtained certain CRA proprietary information that it otherwise would not have been able to obtain.  And, CRA has not been given similar access to Spectrum's information.  For instance, CRA has not been provided with drawings for Spectrum's facilities, although CRA understands that Spectrum may have obtained that information for CRA's facilities.

> Also, the solicitation presently provides for a six-month transition period covering all mobilization costs including, but not limited to, facility build-out/alterations.  Here, the Army apparently has given Spectrum a three-month head start and presumably already has paid Spectrum for performing some of the work that was and will be required by the solicitation.  CRA looks forward to seeing how the Army will address in new evaluation language what essentially is a price subsidy given to Spectrum by the Army.

- 10 -

On November 4, 2010, and, again, on November 8, 2010, the Army amended the RFP – these amendments were neither substantive nor, in particular, addressed the concerns raised by CRA in its October 14 letter.  On November 4, 2010, the Army issued Spectrum a letter raising discussion issues focusing on the work experience of Spectrum's subcontractor and on Spectrum's professional compensation.  On that day, the Army issued CRA a letter raising discussion issues concerning CRA's proposal in the areas of access to care, facility location and layout, staffing, and price.  Both letters requested the respective offeror to "mark changes to your Technical Proposal (Volume II) by showing highlights or marking margins."  It also asked them to provide support for their professional compensation and to explain how their proposed labor rates comply with the Professional Services Clause, FAR § 52.222-46.  Supplemental discussion letters were sent to the offerors on November 8, 2010.

On November 29, 2010, the parties each submitted revised proposals.  As requested, Spectrum marked its revised proposal to reveal the points at which it had added detail to its transition plan, increased compensation for certain professional employees, and provided past performance information for its subcontractor.  In addition, Spectrum proposed to provide incumbents with equivalent benefits and retained seniority and to add a drive-through pharmacy for its FHC-S.  Spectrum noted the activities that it had already completed, including its completion of fifty percent of the construction at both FHC facilities.  It removed that cost of work already completed from its monthly transition CLIN pricing, which, when combined with other reductions, had the effect of reducing its overall transition price by $[].  Owing to its prior work, Spectrum also committed to an accelerated transition schedule, under which full services would be made available on October 1, 2011.

CRA decided against marking up its original proposal and instead submitted a new proposal, explaining that "[d]ue to the substantial extent of changes and to avoid confusion with page, text, graphic, and/or exhibit changes, we are submitting a completely rewritten proposal."  CRA's new proposal scaled down its proposed price by more than $[], from $[] to [].  CRA accomplished this by scaling back its proposed transition plan and facility expansion and renovations, reducing its compensation rates and fringe benefits, and cutting annual salary escalations from [] to amounts ranging from [] to [].

After receiving the proposals, the Army reconvened the SSEB.  On November 30, 2010, and December 2, 2010, the SSEB produced consensus evaluation worksheets for CRA and Spectrum, respectively; no independent written evaluations were done by the individual members of the board.  The evaluations, which were accompanied by written explanations (itemizing strengths and weaknesses), reflected the following:

| Factors | Spectrum | CRAssociates |
|---|---|---|
| 1.  Personnel | | |
|   1A.  Recruitment | Good | Good |
|   1B.  Retention/Employee Relations | Satisfactory | Satisfactory |
|   1C.  Compensation | Satisfactory | Satisfactory |
| 2.  Management Plan | | |
|   2A.  Demand Management | Satisfactory | Marginal |
|   2B.  Education Programs | Satisfactory | Satisfactory |
|   2C.  Program Objectives | Satisfactory | Satisfactory |
| 3.  Facility Location & Layout | Good | Marginal |
| 4.  Staffing Model | Satisfactory | Marginal |
| 5.  Transition Plan | Good | Marginal |
| 6.  Quality Control Plan | Satisfactory | Good |
| 7.  Subcontracting Opportunities | Satisfactory | Satisfactory |

On December 6, 2010, the Army amended the solicitation a third and final time.  On December 7, and December 23, 2010, the Army issued CRA and Spectrum letters raising issues about some, but not all, of the weaknesses that had been identified in their proposals.  CRA's letter raised weaknesses as to each of the factors and subfactors on which CRA had received a marginal rating; it did not raise issues about weaknesses that had been identified with respect to other factors/subfactors on which CRA had received a higher adjectival rating.  The letters to Spectrum raised issues about the weaknesses identified as to factors 1C and 4 (both of which received satisfactory ratings).[4]

On January 6, 2011, the parties again submitted revised proposals.  The Army then received further revised proposals from both offerors, which were forwarded to the SSEB members for evaluation and consensus.  During this period, the CO reviewed the pricing proposals for, *inter alia*, cost realism and professional compensation requirements.[5]  On January

---

[4]  One of the letters to Spectrum contains what appears to be a typographical error that, at first blush, suggests that Spectrum was also advised as to a weakness with respect to factor 1B.  A careful review of the record indicates, however, that no discussions were held with Spectrum as to this subfactor.

[5]  A report filed by the CO indicated, regarding the analysis of the professional compensation requirements, that "[b]oth proposals provided supporting rationale for the basis of their direct labor rates consisting of market surveys, published salary surveys, and [Department of Labor] wage determination."  The report also stated that an "on-site review of payroll records was made at CRAssociates corporate offices," the purpose of which "was to determine the reasonableness of proposed professional salaries for the solicitation for continued operations of the DACH Family health clinics as the bridge contract offered current salaries being paid by the incumbent contractor, CRAssociates."  The report contained detailed information regarding seventy employees in a variety of positions.  It found that "[o]f those seventy employees, CRA is paying more than Spectrum is proposing for 19 positions, leaving Spectrum proposing 51 positions [with] more compensation than CRA is paying."  Based on this data, the CO concluded that "Spectrum has proposed reasonable, realistic salaries for its professional employees as there

11, 2011, the SSEB produced new consensus evaluation worksheets for CRA and Spectrum. Those worksheets raised CRA's ratings in factors 2A and 4 from "marginal" to "satisfactory," but did not raise the "marginal" that CRA had received on factors 3 and 5. The same worksheets raised Spectrum's rating for factor 1C from "satisfactory" to "good." The CO continued to harbor concerns about both offerors' prices.

On January 28, 2011, the Army issued new discussion letters to CRA and Spectrum – the letter to CRA raised questions about factors 3 (facility location and layout) and 5 (transition plan); both letters focused on pricing issues. On February 8, 2011, both offerors submitted revised proposals. On February 24, 2011, the SSEB reevaluated CRA's technical proposal and raised its "marginal" ratings on factors 3 and 5 to "satisfactory." Spectrum technical proposal was not reevaluated by the SSEB. The CO also reviewed the pricing issues for both offerors, conducted a further review in accordance with 48 C.F.R. § 52.222-46, and determined that both offers were realistic and that a fair and reasonable price could be determined based on comparison with competitive pricing in accordance with FAR 15.404. On March 10, 2011, the Army sent the parties letters raising only minor issues and requesting final proposal revisions. On March 22, 2011, the parties submitted their final proposals.

No new technical evaluations were performed after the final proposal submissions. On March 28, 2011, the SSA was briefed about the proposals. As reflected in the presentation slides used at that meeting, the final technical ratings for the two offerors were as follows (the ratings from the evaluation that preceded the original award, if different, are included in parentheses).

| Factors | Spectrum | CRAssociates |
|---|---|---|
| 1. Personnel | Good | Satisfactory (Good) |
| 1A. Recruitment | Good | Good |
| 1B. Retention/Employee Relations | Satisfactory | Satisfactory (Good) |
| 1C. Compensation | Good | Satisfactory (Good) |
| 2. Management Plan | Satisfactory | Satisfactory |
| 2A. Demand Management | Satisfactory | Satisfactory (Marginal) |
| 2B. Education Programs | Satisfactory | Satisfactory (Good) |
| 2C. Program Objectives | Satisfactory | Satisfactory |
| 3. Facility Location & Layout | Good | Satisfactory |
| 4. Staffing Model | Satisfactory | Satisfactory (Marginal) |
| 5. Transition Plan | Good | Satisfactory |
| 6. Quality Control Plan | Satisfactory | Good |
| 7. Subcontracting Opportunities | Satisfactory | Satisfactory |
| 8. Past and Present Performance | Unknown | Good |
| Price | $[] | $[] |

are sufficient dollars in [S]pectrum's proposal to provide continuity of service between CRA professional incumbent employees and that of Spectrum's proposal."

Based on this information, as well as the underlying documentation, the SSA, on May 11, 2011, decided to award the contract to Spectrum.[6]

The Army then awarded Contract W81K04-11-C-0012 (Contract 12), and both offerors were notified of the award and debriefed.  On June 27, 2011, CRA filed a protest at the GAO.  On June 11, 2011, the Army responded by taking corrective action.  Specifically, the Army issued a stop work order, and the contracting officer addressed CRA's allegations.  To evaluate CRA's contentions about parking at Spectrum's proposed facility, the CO conducted a separate analysis of Spectrum's parking.  On July 18, 2011, the GAO dismissed the protest.  The CO then prepared another briefing for the SSA, after which the SSA, on August 9, 2011, again decided to award the contract to Spectrum.  Thereafter, both parties were notified of the SSA's decision and debriefed.

## H.      Second Court Proceeding

On September 7, 2011, CRA filed a second complaint in this court, together with an application for a temporary restraining order and a motion for a preliminary injunction.  On September 8, 2011, Spectrum filed a motion to intervene as defendant-intervenor, which the court granted that same day.  On September 9, 2011, the court held a status conference at which the parties agreed to move forward on the merits with an accelerated briefing schedule.  Pursuant to that schedule, on October 4, 2011, plaintiff filed a motion for judgment on the

---

[6]  In a memorandum dated May 11, 2011, the CO described his reasons for selecting Spectrum.  This memorandum noted that Spectrum had received high ratings on the most important technical factors (1 through 4).  Regarding professional compensation, this memorandum explained –

> A comparison of Spectrum's proposed professional compensation to CRA's actual compensation shows that Spectrum is somewhat lower in 3 categories and significantly higher in 4 other categories.  CRA has proposed significantly higher rates in the base period than their current actual compensation being paid under the existing bridge contract.  Spectrum's proposed price would pay more than the current professional compensation amount to 51 of the 70 comparable positions and contains enough professional compensation money to pay the other 19 professional positions at least their current compensation amounts.  Overall Spectrum proposed a sufficient total professional compensation dollar amount in their price proposal to meet current average actuals being paid.  The staffing level of both offerors was determined satisfactory.

In the end, the CO concluded that "Spectrum's overall proposal (technical, past/present performance, and price) offers the best value (more of what was most important to the government and offers it at a lower total price) to the Government in accordance with the evaluation criteria in Section M of the solicitation," adding that "[t]he additional price of the CRA proposal is not worth any potential benefit found in the CRA technical and past performance proposals that would justify the additional $[]."

- 14 -

administrative record.  On October 24, 2011, defendant and defendant-intervenor filed cross-motions for judgment on the administrative record.  Following completion of the briefing, the court held oral argument on the motion on November 29, 2011.[7]

## II.   DISCUSSION

Before turning, in detail, to plaintiff's substantive claims, we begin with common ground.

### A.   Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact."  *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record.  *Id.* at 1356.  The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding.  *Id.*; *see also Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005).  Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record."  *Bannum*, 404 F.3d at 1354; *see also NEQ, LLC v. United States*, 88 Fed. Cl. 38, 46 (2009); *Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005).

*Bannum*'s approach is well-suited to the limited nature of the review conducted in bid protests.  In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4).  By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking."  *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 105 (1983); *see Glenn Defense Marine (Asia) PTE, Ltd. v. United States*, 97 Fed. Cl. 311, 317 (2011); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003).  As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the court must restrain itself from examining information that was not available to the agency.  Failing to do so, the Federal Circuit recently observed, risks converting arbitrary and capricious review into a subtle form of *de novo* review.  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–80 (Fed. Cir. 2009).  At all events, this court will interfere with the government procurement process "only in extremely limited circumstances."  *CACI, Inc.-Fed. v.*

---

[7] CRA continues to provide services to the Army under the aforementioned bridge contract.

*United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)).

The aggrieved bidder must demonstrate that the challenged agency decision was either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004), *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 201 (2007). Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).[8] "Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." *NEQ*, 88 Fed. Cl. at 47; *see also Banknote Corp.*, 56 Fed. Cl. at 380–81; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000).

## B.    Alleged Errors in the Procurement Process

With this basic analytical framework in mind, the court now turns to the specific allegations of error here.

### (1)    Failure to Address Impact of Spectrum's Prior Performance

Initially, plaintiff claims that Spectrum gained an unfair competitive advantage in the second award competition from its partial performance of the contract that was set aside by this court. It argues that the Army violated the FAR in failing to identify and mitigate a significant

_____

[8]  Federal Circuit cases indicate that this prejudice analysis comes in two varieties. The first is that described above – namely, the ultimate requirement that a protestor must show prejudice in order to merit relief. A second prejudice analysis is more in the nature of a preliminary standing inquiry. In this regard, the Federal Circuit has held that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002); *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 109 n.5 (2003). Cases construing this second variation on the prejudice inquiry have held that it requires merely a "viable allegation of agency wrong doing," with "'viability' turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true." *McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007); *see also 210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 719 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284-85 (2006). Because of the central nature of the allegations of error here, the court concludes that plaintiff has met this preliminary "standing" threshold – and defendant does not contend otherwise.

organizational conflict of interest (OCI) that arose when Spectrum gained access to certain information during this performance.  More specifically, CRA asserts that, via its prior performance, Spectrum obtained unequal access to source selection and another nonpublic information and that the Army failed to identify and mitigate the resulting OCI under FAR §§ 9.504 and 9.506.[9]  Plaintiff contends that the Army compounded this error when it failed to adjust Spectrum's price on the second contract to account for amounts already paid to Spectrum on the first contract.  The Army's inaction in this regard, plaintiff asserts, gave Spectrum an uncompetitive price advantage.

While the court has serious questions about the merits of these claims,[10] it agrees with defendant and defendant-intervenor that plaintiff waived these claims when it failed to raise them prior to the close of the bidding process.  It is axiomatic that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives it ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue and Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  Citing the desire to prevent contractors "from taking advantage of the government and other bidders" and to "avoid[] costly after-the-fact litigation," the Federal Circuit, in *Blue and Gold*, stated that "'[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive the award.'"  *Id.* at 1314 (quoting *Argencord Mach. & Equip. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005)); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009).  *Blue and Gold* thus prevents a protester from raising *post-hoc* objections to the terms of a solicitation.[11]  Yet, that is precisely what CRA seeks to do here.

---

[9]  For a detailed discussion of these provisions, *see NetStar-1 Gov't Consulting, Inc. v. United States*, 2011 WL 4937433, at *8-10 (Fed. Cl. Oct. 17, 2011).

[10]  Plaintiff's claims regarding the existence of an alleged unequal information OCI lack significant details, suggesting that it would be difficult for this court to conclude that the type of information to which Spectrum had access was different from that typically obtained by incumbents.  *Cf. C.A.C.I, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581-82 (Fed. Cir. 1983) (requiring "hard facts" to establish an apparent or actual OCI).  This court has made clear that "the government need not forego the benefits of incumbency in ensuring a level playing field." *ARINC Eng'g Serv.*, 77 Fed. Cl. at 203; *see also PAI Corp. v. United States*, 614 F.3d 1347, 1353-54 (Fed. Cir. 2010) ("The mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage, and an agency is not required to compensate for every competitive advantage gleaned by a potential offeror's prior performance of a particular requirement . . . ." (quoting *ARINC*, 77 Fed. Cl. at 203)).  Likewise, the court is dubious that the price "advantage" Spectrum derived from its partial performance of the prior contract is fundamentally different from the price "advantage" that CRA derived from being the incumbent.

[11]  *See Hi-Tech Bed Systems, Corp. v. United States*, 97 Fed. Cl. 349, 354 (2011) ("This Court has applied *Blue and Gold* to prevent parties from raising post-hoc objections to a solicitation."); *Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 8-9 (2008) (plaintiff

When CRA expressed interest in continuing to compete, it asked the Army to amend the RFP to address two concerns that CRA believed arose from Spectrum's prior performance of the enjoined contract – not coincidentally, the same two issues (the existence of an unequal information OCI and a price advantage) that CRA raises now. Yet when, through several succeeding amendments to the RFP, the Army did not address these points, CRA did nothing. It bided its time, acting only after the second contract was awarded to Spectrum. Given its lack of diligence, CRA should not be heard to argue now – after the award – that the agency erred in failing to amend the RFP to deal with the concerns CRA associates with Spectrum's prior performance. *See Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 90 (2011) ("a bidder may not stay silent about a flaw in a solicitation in the hopes either of winning a contract or, alternatively, protesting the content of the solicitation request in the event it fails to receive an award"); *Infrastructure Defense Techs., LLC v. United States*, 81 Fed. Cl. 375, 389 (2008) (citing numerous cases applying this waiver rule). Moreover, CRA cannot escape this waiver rule by asserting that, wholly apart from the terms of the RFP, the Army should have identified and mitigated an unequal information OCI, as required by the FAR. In the court's view, the rationale of *Blue and Gold* leads to the conclusion that a contractor should not be allowed to protest an agency's failure to identify and mitigate an OCI when the contractor knew about the alleged OCI from the start, but failed to assert it, via protest, prior to the award. [12]

---

waived objection to portion of solicitation designating the procurement as a small business set aside by failing to object prior to the contract award); *Frazier v. United States*, 79 Fed. Cl. 148, 177 (2007), *aff'd*, 301 Fed. Appx. 974 (Fed. Cir. 2008) (noting that "[t]he proper time to challenge the provisions of a prospectus is before bids are required to be submitted, in a pre-award bid protest"); *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 733 (2007) (finding that the protest "should have been raised before proposals were submitted"); *Masai Techs. Corp. v. United States*, 79 Fed. Cl. 433, 444 (2007) ("To the extent [the protestor] believed that the citizenship requirement [in the RFQ] was too stringent or otherwise improper, [the protestor] should have raised its objection with the Army prior to submitting its proposal.").

[12] A number of cases hold that arguments that should have been raised prior to an award are waived, even if they do not relate to ambiguities or errors in the solicitation. *See*, *e.g.*, *Banknote Corp.*, 56 Fed. Cl. at 386; *North Car. Div. of Servs. for Blind v. United States*, 53 Fed. Cl. 147, 165-66 (2002), *aff'd*, 60 Fed. Appx. 826 (Fed. Cir. 2003); *Cubic Defense Sys., Inc. v. United States*, 45 Fed. Cl. 450, 461 (1999); *see also Northrop Grumman, Inc.*, 2009 C.P.D. ¶ 167 (2009); *Domain Name Alliance Registry*, 2008 C.P.D. ¶ 168 (2008). This court's recent decision in *Netstar-1 Gov't Consulting, Inc.*, 2011 WL 4937433, is not to the contrary. In that case, NetStar did not know that a competitor with an alleged unequal information OCI was bidding until after the award decision was announced. Because of this, the court rejected defendant's reliance on the *Blue and Gold Fleet* decision, noting that "[n]o doctrine or case requires a potential protestor to be clairvoyant or to police an agency's general noncompliance with the FAR on the possibility that such misfeasance might become relevant in a protest." *NetStar-1*, 2011 WL 4937433, at *9 n.17. No clairvoyance is called for here. CRA obviously knew that Spectrum would be its competitor on the second procurement and, as its correspondence with the

Accordingly, by holding its fire until after the contract was awarded to its competitor, CRA waived its opportunity to raise issues concerning Spectrum's prior performance of the enjoined contract.

## (2)      Failure to Follow RFP Evaluation Scheme

Plaintiff next contends that the Army departed from the RFP's evaluation scheme in making the second award to Spectrum.  Ample case law documents that such an error could lead to the award here being set aside as arbitrary, capricious or otherwise contrary to law.  *See Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 364 (2009); *see also* John Cibinic, Jr., Ralph C. Nash, Jr. & Christopher R. Yukins, Formation of Government Contracts 812 (4th ed. 2011) ("Evaluations will be found to be improper if the evaluators do not comply with the evaluation scheme set forth in the RFP."); *id*. at 813 ("Agencies must also perform the evaluation in accordance with the procedures in the RFP." (citing numerous cases)).

CRA asserts that, in making the second award to Spectrum, the Army failed to comply with the portion of the RFP (clause 4.2) that indicated that "each evaluator will conduct an independent evaluation of each proposal documenting the strengths, deficiencies, significant weaknesses, and risks associated with each proposal."  It argues that, in denigration of this provision, the Army, in conducting the second procurement, developed only consensus evaluations of the technical proposals.  Defendant does not deny the latter assertion.  It contends, however, that the use of consensus evaluations did not violate the RFP, which did not require the Army to repeat all of the award procedures performed in the first procurement in dealing with the limited set of issues identified by this court in setting aside the first award.  The court agrees.

As a threshold matter, the court notes that the principles governing the interpretation of government contracts apply with equal force to the interpretations of RFPs.  *See Banknote Corp.,* 365 F.3d at 1353 n.4.  That means that the court's analysis of the RFP begins with the "plain meaning of the document."  *Id*. at 1353; *see also Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996).  Contrary to plaintiff's claims, nothing in the language of the RFP purports to specify the evaluation scheme that the Army was to employ if a protest of the initial award of the contract was sustained.  Indeed, the October 4, 2010, letters sent by the Army to the offerors after this court's decision made clear that the Army was not starting the procurement anew, but rather was "reopening limited discussions" with an intent "to award a new contract as result of further negotiations under this solicitation."  Consistent with this view, subsequent letters made clear that the offerors only had to revise certain portions of their proposals.  In reviewing those revised proposals, the Army prepared a new consensus document to demonstrate

---

Army revealed, was concerned that Spectrum had gained an inappropriate competitive advantages via its prior performance.  Yet, CRA did not protest these points prior to the award decision.

the team's combined conclusions; the individual evaluator's assessments from the first procurement remained part of the record.

Nothing in the RFP prevented the agency from using this process. In arguing otherwise, CRA simply assumes that all the provisions of the RFP governing the procedures for evaluating the initial proposals remained applicable to the second award. But, plaintiff cites no language in support of this proposition. In a situation like this, where a prior award has been set aside, the procuring agency is charged with implementing the terms of the court's injunction and reasonably addressing the deficiencies identified in the decision sustaining the protest. *See Jacobs Tech., Inc. v. United States*, 100 Fed. Cl. 198, 219 (2011); *ManTech Telecomm. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 65 n.13 (2001), *aff'd*, 30 Fed. Appx. 995 (Fed. Cir. 2002).[13] Except as bound by the terms of that injunction/decision, the overarching requirements of the FAR, and those provisions in the RFP that remain applicable, the agency has considerable discretion in deciding how best to address the errors that led to the prior award being enjoined. In exercising that discretion, the agency may – and, at times, must – implement evaluation procedures that supplement those in the original RFP. Fairly viewed, that is what defendant did here. While plaintiff did not know the precise path the Army was going to take in evaluating the revised proposals, it knew that the Army was proceeding with the second award without making significant amendments to the RFP and without calling for entirely new proposals.[14] Plaintiff thus was on notice that the Army was using a different, somewhat truncated process to evaluate the revised proposals. CRA has not shown that this supplementary evaluation process was in any way arbitrary or capricious. Nor has it presented a single authority indicating that, in a case like this, an agency may not supplement the evaluation terms of the original RFP without formally amending that document. That result is not surprising as neither the FAR, nor the underlying Competition in Contracting Act (CICA), requires an agency to spell out every detail regarding an internal evaluation process in an RFP. *See* FAR § 15.203(a) (listing what must be contained in an RFP); 10 U.S.C. § 2305(a)(2); *see also HG Props. A., L.P.*, 98-2 C.P.D. ¶ 104 (1998).[15]

---

[13] The General Accountability Office (GAO) has taken a similar view in reviewing protests contending that an agency has failed properly to implement a prior GAO protest recommendation. *See Mechanical Contractors, S.A.*, 98-1 C.P.D. ¶ 68 (1998); *see also* 3 Steven W. Feldman, Government Contract Awards: Negotiation & Sealed Bidding § 34:2 (2008) (hereinafter "Feldman").

[14] In part 1, the RFP contained detailed requirements for initial proposal submissions which were not employed by the Army in requesting revised proposals from CRA and Spectrum. These provisions, *inter alia*, indicate that "[t]he Government intends to make award without holding discussions with offerors." Plaintiff knew, from the correspondence it had received from the Army, that these provisions were not being followed on the reprocurement.

[15] Ordinarily, details of the sort encountered here would be found in a source selection plan. Unless somehow published to the offerors, the provisions of such a plan do not bind the agency, however, and thus cannot be the basis for a protest. *See ManTech Telecomms. & Info Sys.*, 49 Fed. Cl. at 67 (noting that the source selection plan "has little, if any, bearing in defining the rights of the parties under the [s]olicitation" (citing additional cases)).

Even if the Army should have amended the RFP to specify that it was using only consensus evaluations in making the second award, the court has great difficulty in seeing how this failure competitively prejudiced CRA.  To find that it did, the court must conclude that the use of individual evaluations as the precursor for consensus evaluations would have caused CRA to receive higher technical ratings – high enough to give it some likelihood of obtaining the award in question.  *See Orca Northwest Real Estate Servs. v. United States*, 65 Fed. Cl. 419, 421-22 (2005) (protestor did not establish that agency procedural error in conduction reevaluation of proposals was prejudicial).  Yet, there is no reason to believe this – certainly none that plaintiff has supplied – and every reason instead to view any deviation here from the RFP rather as a "'*de minimis* error[] . . . that [] can safely be ignored.'"  *Grumman Data Sys.*, 88 F.3d at 1000 (quoting *Anderson Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)); *see also Ryan Co. v. United States*, 43 Fed. Cl. 646, 654 n.10 (1999).  As indication of the latter point, it should be noted that after each round of discussions, each individual evaluator signed his or her concurrence with the "consensus opinion of each offeror's ability to accomplish the projected work" and the "narrative supporting the team's conclusions."  Thus, it would appear that the evaluations in question represented a true consensus and were neither dictated nor coerced by the head of the SSEB or the SSA.

In contending otherwise, CRA argues that the Army was predisposed to select Spectrum for the second award, to avoid having to pay Spectrum for transition costs that the contractor incurred on the first contract.  At oral argument, plaintiff conceded that this claim is tantamount to arguing that the Army proceeded in bad faith.  CRA, however, candidly admitted that it had not made this argument explicitly because it lacked clear and convincing evidence of bad faith, as is required by the decisional law.  *See Savantage Financial Servs., Inc. v. United States*, 595 F.3d 1282, 1288 (Fed. Cir. 2010) (rejecting argument that agency made "pretextual attempt to circumvent the trial court's earlier injunction" and favor one competitor over another"); *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238-39 (Fed. Cir. 2002) (noting that a "high burden must be carried to overcome" the presumption that government officials act in good faith).  This court is disinclined to give any credence to the "pretext" arguments made by plaintiff – albeit ones that fastidiously avoid invoking phrases like "bad faith" – absent some indication that the ratings that plaintiff received were arbitrary and capricious.  *See Jacobs Tech.*, 100 Fed. Cl. at 220 (rejecting a claim that the agency, after a sustained protest, sought to "steer[] the award" to the original awardee).[16]  To put it another way – this court will not allow through the back door a claim that barred at the front by plaintiff's inability to overcome evidentiary hurdles.

---

[16]  In making versions of this pretext argument, plaintiff notes that some of the features in its revised proposal that did not change from its initial proposals were rated lower the second time than the first.  But, as this court stated in rejecting a similar claim made in another case, "it is certainly the Army's prerogative to change its mind – its failure to identify an existing weakness in a proposal does not preclude the Army from considering the weakness later."  *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 604 (2006).

(3)   **Failure to Conduct Meaningful and Even-Handed Discussions**

In its next challenge to the award decision, plaintiff complains about how the Army conducted discussions prior to the second award.  Among other things, CRA protests that the Army did not discuss with it certain factors on which weaknesses had been identified, while discussing with Spectrum factors on which no weaknesses had been identified.  This unequal treatment, plaintiff asseverates, prevented CRA from improving its proposal, while allowing Spectrum to raise its ratings.

As the parties agree, agencies generally are required to conduct "meaningful" discussions with all responsible offerors that submit proposals within the competitive range.  See 48 C.F.R. § 15.306(d); *see also EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 226 (2005), *aff'd*, 163 Fed. Appx. 892 (Fed. Cir. 2006); *Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 124, 131 (2000) (stating that "[t]he law is well-settled that discussions between a contracting officer and offerors must be meaningful").  When conducting such discussions, the agency may not "engage in conduct that . . . [f]avors one offeror over another."  48 C.F.R. § 15.306(e); *see also Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 329 (2009) ("This regulation does not permit a procuring agency to engage in unequal discussions  . . . .").  That said, every competitor need not – and, indeed, should not – be treated exactly the same.  In this regard, the FAR emphasizes that "the contracting officer is not required to discuss every area where the proposal could be improved" and that instead "[t]he scope and extent of discussions are a matter of contracting officer judgment."  48 C.F.R. § 15.306(d)(3); *see also Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 432 (2010); *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 217 n.25 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).  Under these provisions, "'[t]he government need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others.'"  *Cube Corp. v. United States*, 46 Fed. Cl. 368, 384 (2000) (quoting *ACRA, Inc. v. United States*, 44 Fed. Cl. 288, 295-96 (1999)); *see also EP Prods.*, 63 Fed. Cl. at 226–27; *JWK Int'l Corp. v. United States*, 49 Fed. Cl. 371, 394 (2001), *aff'd*, 279 F.3d 985 (Fed. Cir. 2002) ("The procuring agency does not have to identify every item that might improve an offeror's proposal."); *Dynacs*, 48 Fed. Cl. at 131.  In other words, the agency need not "address all aspects of a proposal that are less than optimal."  *DMS All-Star Jt. Venture v. United States*, 90 Fed. Cl. 653, 670 (2010).

While playing lip service to these precedents, plaintiff seeks to promote precisely the sort of tit for tat approach to discussions that the decisional law has generally eschewed.  Thus, the cases have rejected an approach to discussions that requires perfect parallelism because discussions are supposed to be "tailor[ed] . . . to each offeror's proposal" and to the deficiencies and weaknesses identified therein.  FAR § 15.306(d)(1); *see also Dynacs*, 48 Fed. Cl. at 135; *Drexel Heritage Furnishings, Inc. v. United States*, 7 Cl. Ct. 134, 152 (1984), *aff'd*, 809 F.2d 790 (Fed. Cir. 1996).  "Since the need for clarifications or revisions will vary with the proposals," *WorldTravelServices v. United States*, 49 Fed. Cl. 431, 439 (2001), and since the concept of what is "meaningful" hinges on those differences, *see PRI, Inc.*, 84-1 C.P.D. ¶ 345 (1984), the FAR and the decisional law interpreting it provide few bright line rules.  To be sure, it is relatively

- 22 -

clear that if two proposals share a critical feature that the agency views as highly problematic, the agency is not free to talk to one offeror about that issue without talking to the other.[17] Beyond this, though, there are very few affirmative requirements for discussions, with the main exceptions being found in FAR § 15.306(d)(3), which obliges the agency: (i) to conduct discussion with all offerors in the competitive range if it holds discussions with one of the offerors in that group; and (ii) to discuss "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity respond."  FAR § 15.306(d)(3).[18]  Attempts by protesters to expand this list of infrangible rules have proven unavailing.  2 Feldman, *supra*, at § 16:11, p. 16-41.  Thus, the requisite quality of discussions will not be measured according to whether the agency asked each offeror the same discussion questions;[19] spent an equal amount of time in conducting discussions with each offeror;[20] or discussed the same topics with each offeror.[21]  *See also Kerr Contractors*, 89 Fed. Cl. at 328; *Femme Comp., Inc. v. United States*, 83 Fed. Cl. 704, 708 (2008) ("agencies are not required to conduct identical discussions with each offeror"); *WorldTravelServices.*, 49 Fed. Cl. at 440.

---

[17]  *See*, *e.g.*, *Core Tech Int'l Corp.*, 2009 C.P.D. ¶ 59 (agency asked one offeror to fix informational deficiencies in its experience information but did not ask protester to do the same); *Boeing Co.,* 2008 C.P.D. ¶ 114; *Morrison Knudsen Corp.*, 96-2 C.P.D. ¶ 86 (1996) (agency told awardee that it needed to modify its proposal to include a list of equipment but did not inform the protester of this); *Nat'l Med. Staffing, Inc.*, 95-1 C.P.D. ¶ 163 (1995).

[18]  FAR § 15.306(e) lists some requirements in the negative – to wit, that the agency must avoid favoring one offeror over another, revealing one firm's technical solutions or intellectual property to another, or revealing one firm's price to another.  *See* 2 Feldman, *supra*, at §16:2 at p. 16-8.  Likewise discussions may not be misleading or favor one offeror over another.

[19]  *See Analytical & Research Tech, Inc. v. United States*, 39 Fed. Cl. 34, 51-52 (1997); *Cygnus Corp.*, 97-1 C.P.D. ¶ 63 (1997) ("There is also no requirement that offerors be asked the same number of questions."); *Textron Marine Sup.*, 94-2 C.P.D. § 63 (1994); *Trident Sys., Inc.*, 91-1 C.P.D. ¶ 604 (1991); *see also* 2 Feldman, *supra*, at § 16:12.  Indeed, several cases hold that an agency acted arbitrarily when it used the same questions for all offerors unrelated to the perceived weaknesses or deficiencies existing in particular proposals.  *Furono U.S.A., Inc.*, 86-1 C.P.D. ¶ 400 (1986); *Price Waterhouse*, 86-1 C.P.D. ¶ 54 (1986).

[20]  *See*, *e.g.*, *Pacific Architects & Eng'rs, Inc.*, 89-2 C.P.D. ¶ 494 (1989) (agency may properly conduct "extensive discussions with offerors whose initial proposals contain technical deficiencies while conducting more limited discussions with offerors whose proposals contain fewer weaknesses or deficiencies"); *see also Drexel Heritage Furnishings*, 7 Cl. Ct. at 154 ("There is no rule requiring that a particular or equal amount of time must be spent in evaluating offers.").

[21]  *See*, *e.g.*, *Cherokee Inf. Servs.*, 2001 C.P.D. ¶ 77 (2001); *see also* Feldman, *supra*, at § 16:12, p 16-50 – 16-51("Although both regulation and case law require the equal treatment of offerors during discussions, the extent of discussions naturally will vary among the offerors, because the number and gravity of proposal weaknesses will be different for each firm.").

Though framed in specific terms, CRA's discussion claims are premised upon the sort of anticanons that the decisional law has repeatedly rejected. For example, CRA complains that the Army discussed with Spectrum a newly-assigned weakness under Factor 4 (staffing model) even though it did not discuss with CRA a newly-assigned weakness with Subfactor 1B (employee retention plan). As should be evident from the differing numbers (4 vs. 1B), this claim is not based on any factual parallel between the two situations. Rather, as plaintiff eventually admits, it proceeds from a broader proposition: that the Army was required to discuss every weakness identified in CRA's proposal because that is what it did for Spectrum. One problem with this claim is that the Army, in fact, did not discuss with Spectrum every weakness identified in its proposal; but even if it had, there is no rule – either explicit or deriving from the requirement that discussions be "meaningful" – that required the Army to discuss every weakness that appeared in CRA's proposal. *See Geo-Centers, Inc.*, 97-1 C.P.D. ¶ 182 (1997); *Ann Riley Assocs., Ltd.*, 97-1 C.P.D. ¶ 122 (1997); *see also Fort Carson Support Servs.*, 71 Fed. Cl. at 604 ("the FAR provision requires a discussion of 'significant weaknesses,' not all weaknesses." (quoting FAR § 15.306(d)(3)). Fairness, in this context, is not a matter of bean-counting. Nor, contrary to plaintiff's view, was the Army obliged to discuss with CRA every other aspect of its proposal that might reasonably have been improved. The FAR, of course, advises quite to the contrary, stating, in no uncertain terms, that an agency need not discuss "every area where a proposal could be improved." 28 C.F.R. § 15.306(d)(3).[22] Lastly, it bears emphasis that the Army engaged in broad-ranging discussions with CRA, which over several iterations, covered no less than five subfactors and nearly two dozen items, and, remarkably, resulted in a number of CRA's adjectival ratings being increased. CRA thus should not be heard to argue that the Army was arbitrary and capricious simply because it did not do more.

In sum, the court concludes that the Army did not act arbitrarily, capriciously, or unlawfully in conducting discussions with the offerors here.

### (4) Alleged Flaws in the Army's Technical Evaluation

Likewise tenuous are plaintiff's various claims that the Army evaluations of the offerors' technical proposals were arbitrary and capricious. Regarding challenges to such technical evaluations, the Federal Circuit has long instructed, "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of the procurement officials, and thus reviewing courts give greatest deference possible to these

---

[22]   *See also Standard Commc'ns, Inc. v. United States*, 2011 WL 5865873, at *17 (2011); *Academy Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 460 (2009); *Banknote Corp. of Am.*, 56 Fed. Cl. at 384 (although discussions must be specific, the procuring agency is not required "to address in express detail all inferior or inadequate aspects of a proposal" (quoting *Labat-Anderson, Inc. v. United States,* 42 Fed. Cl. 806, 835 (1999)); *WorldTravelServices*, 49 Fed. Cl. at 439-40 (noting that meaningfulness "does not mean that an agency must 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal" (quoting *LaBarge Elecs.*, 96-1 C.P.D. ¶ 58 (1996)))) (internal quotation marks omitted).

determinations." *E.W. Bliss*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 174 (2009).  This is so, *inter alia*, because "the procuring agency . . . must bear the burden of any difficulties incurred by reason of a defective evaluation." *JWK Int'l Corp.*, 52 Fed. Cl. 650, 659 (2002), *aff'd*, 56 Fed. Appx. 474 (Fed. Cir. 2003); *see also Bannum, Inc.*, 91 Fed. Cl. at 174.

In a laundry list of complaints, plaintiff asserts that the Army, in analyzing the technical proposals, did not treat the two offerors equally – that it ignored or misconstrued criteria in the RFP, so as systematically to favor Spectrum and disfavor CRA; that it neither credited CRA for the positives in its proposal nor discredited Spectrum for the negatives in its offering.  But, plaintiff has neither demonstrated that the contracting officer's findings are unsupported by the administrative record nor that they are inconsistent with the evaluation criteria.  Rather, it offers little more than mere disagreements with the contracting officer's particular assessment of the various features of the offerors' technical proposals.  And, as this court has often remarked, that is not nearly enough to demonstrate that the CO's findings were arbitrary or capricious.  *See Banknote Corp.*, 56 Fed. Cl. at 384 ("[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." (quotation and citation omitted)); *JWK Int'l Corp.*, 52 Fed. Cl. at 660 ("[N]aked claims, by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that . . . findings were the product of an irrational process and hence arbitrary and capricious.").

### (5)    Evaluation of Professional Compensation

Plaintiff's next argument is a reprise of an argument it won in the first case:  that the Army failed to evaluate properly Spectrum's professional employee compensation plan in accordance with the requirements of the professional services clause found at FAR § 52.222-46, which was incorporated by reference into the RFP.  The latter clause "is required to be inserted in RFPs for contracts expected to exceed $500,000 when the service to be provided 'will require meaningful numbers of professional employees.'"  *Statistica*, 102 F.3d at 1579 (quoting 48 C.F.R. § 22.1103); *see also K-Mar Indus. Inc. v. United States*, 91 Fed. Cl. 20, 23 (2010), *aff'd*, 407 Fed. Appx. 434 (Fed. Cir. 2011).  Plaintiff contends that had the Army performed the required evaluation, it would have discovered serious problems with Spectrum's compensation plan.  This court disagrees.

The subject clause states that "lowering the compensation (salaries and fringe benefits) paid or furnished professional employees" can be "detrimental in obtaining the quality of professional services needed for adequate contract performance." 48 C.F.R. § 52.222–46(a).  To avoid this, the clause requires offerors to "submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract." *Id*.  This paragraph further indicates that "[t]he Government will evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements." *Id*.  It goes on to provide that "[t]his evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work" as well as the plan's "impact upon recruiting and

retention, its realism, and its consistency with the total plan for compensation." *Id*. The clause states that "[s]upporting information will include data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure." *Id*.[23] While noting that compensation levels in a proposal may be lower than those of predecessor contracts, the clause explains that such reductions "will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees." *Id*. at § 52.222–46(b). "[L]owered compensation for essentially the same professional work," the clause cautions, "may indicate lack of sound management judgment and lack of understanding of the requirement," *id*., adding that "[p]rofessional compensation that is unrealistically low or not in reasonable relationship to the various job categories, since it may impair the Contractor's ability to attract and retain competent professional service employees, may be viewed as evidence of failure to comprehend the complexity of the contract requirements," *id*. at § 52.222–46(c); *see CRAssociates, Inc.*, 95 Fed. Cl. at 369-70.[24]

In the first case, this court found that "[a] careful search of the contemporaneous administrative record reveals no indication whatsoever that anyone at the Army focused upon the requirements of this professional services clause during the evaluation process." *CRAssociates*, 95 Fed. Cl. at 372. That is not the case now. A review of the administrative record reveals that unlike in the first instance, the Army here conducted a comprehensive analysis of how the professionals' pay would likely be altered by Spectrum's proposal. This analysis looked at all the relevant professional categories and made specific observations as to whether specific professionals who worked for CRA would be paid more – or less – under Spectrum's proposed rates than they had received under CRA's bridge contract. While the analysis revealed some instances in which Spectrum's proposed pay would be lower than CRA's, the Army, in fact, determined that 51 of the 70 employees affected would be paid more under the pay rates proposed by Spectrum than they had been paid by CRA under the bridge contract. The Army fully and properly considered these and other observations in making the findings required by

---

[23] FAR § 22.1103 states that the clause in FAR § 52.222–46 "requires that offerors submit for evaluation a total compensation plan setting forth proposed salaries and fringe benefits for professional employees working on the contract." This provision states that "[p]lans indicating unrealistically low professional employees compensation may be assessed adversely as one of the factors considered in making an award." FAR § 22.1103.

[24] As this court stated in the first case, "[t]he purpose of the review envisioned by this clause is 'to evaluate whether offerors will obtain and keep the quality of professional services needed for adequate contract performance, and to evaluate whether offerors understand the nature of the work to be performed.'" *CRAssociates*, 95 Fed. Cl. at 370 (quoting *Innovative Mgmt., Inc.*, 2003 C.P.D. ¶ 209 (2003)); *see also ELS, Inc.*, 99–2 C.P.D. ¶ 92 (1999). In this regard, the clause is designed to afford professional services employees protections mirroring those afforded other workers under the McNamara-O'Hara Service Contract Act of 1965 (SCA), Pub.L. 89–286, 41 U.S.C. § 351, *et seq*. *See CRAssociates*, 95 Fed. Cl. at 370.

FAR § 52.222-46.  It did not, therefore, act in an arbitrary or capricious fashion or in violation of this court's prior injunction in conducting this second review of professional compensation.

<b>(6)      Best Value Determination</b>

Lastly, plaintiff has qualms about the agency's best value determination.  This argument, however, is predicated upon the notion that all, or at least a significant number, of the errors alleged by plaintiff are well-founded.  But, that is not the case.  And this court thus rejects, as well, CRA's claim that the Army's best value determination was arbitrary and capricious.  In fact, that decision was adequately documented, evinces "rational reasoning and consideration of relevant factors, and must, therefore, be sustained.  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); *see also Commissioning Solutions Global, LLC v. United States*, 97 Fed. Cl. 1, 11 (2011).

**III.      CONCLUSION**

Having considered, and rejected, the remainder of plaintiff's points, this court need go no further.  In seeking to overturn this award, plaintiff attempts to pile a Pelion of conjecture upon an Ossa of speculation, literally raising dozens of alleged errors in contending that, from the outset, the Army intended to make a second award to Spectrum.  But reminiscent of the Greeks of old, whose stone pile atop Mt. Olympus failed to reach the heavens, plaintiff ultimately fails to convince this court that the second set of evaluations performed by the Army was a pretext for giving the contract to its competitor.

Measured by the appropriate standard of review, the Army's award decision here is neither arbitrary, capricious nor otherwise contrary to law.  The relief requested by plaintiff, thus, is not appropriately granted.

In consideration of the above:

1.      Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's and defendant-intervenor's cross motions for judgment on the administrative record are **GRANTED**.

2.      The court intends to unseal and publish this opinion after January 18, 2012.  On or before January 17, 2012, each party shall file proposed redactions to this opinion, with specific reasons therefor.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge